Third case of the day, Doe v. Emory University, 22-13, 293. We have Ms. Levy here for the appellant, Mr. Boson for the appellee. Yes, sir. Ms. Levy, no hurry, but whenever you're ready. Thank you. Good morning, Your Honors. May it please the Court. My name is Adrienne Levy, and on behalf of the law firm Nassinoff & Miltonburg, I represent the plaintiff appellant, John Doe. Your Honors, the District Court erred as a matter of law and exuded its discretion in three ways in this case. First, the District Court failed to view plaintiff's gender bias allegations in the light most favorable to him. As it was required to do on a Rule 12 motion. Second, the District Court failed to consider plaintiff's contract claim under an implied contract theory and failed to appropriately consider plaintiff's fact allegations regarding mutual assent. And third, the District Court abused its discretion in denying plaintiff's request for even a single opportunity to amend his complaint, despite the absence of any findings of futility, prejudice, or other substantial factors. I'd actually like to start with the last issue first, if that's okay, and talk about the dismissal and prejudice issue. Well, I'd like for you to jump in on Title IX first. You've got to confront squarely our case, Doe v. Sanford, and the procedural irregularities that were alleged in that case were found not to rise to the level of a Title IX violation. You have some procedural irregularities that your client has alleged. Can you tell me how you can distinguish Doe v. Sanford and get past that ruling? Yes, Your Honor, thank you. So the procedural irregularities, I believe in the Sanford case, one of the issues was that the plaintiff had raised on appeal this idea of certain evidence that was not considered or was not submitted. And the court in Sanford found that looking at the policy, in order to raise an evidentiary issue, it had to be new evidence that was not available in the original proceeding. And the court found that there was no allegation that that was the case. And so it essentially held that that was not a procedural error in accordance with the policy. So it looked at the allegations and said, even if this is true, when we read the policy, that's not a violation. And when we talk about procedural errors here, so one of the procedural errors pertained to, for example, the hearing board's finding on responsibility. In accordance with Emory's policy, in order to find non-consent by incapacitation, there has to be a lack of affirmative consent and there has to be a finding of incapacitation, which the policy declares is not just intoxication. It has to rise to the level of incapacitation. But the finding here was incapacitation, correct? Respectfully, the finding here was that Jane Roe could not give informed consent due to being intoxicated. And that language is not consistent with a finding of responsibility under the policy. But Doe v. Sanford says a deviation from a Title IX policy is not in and of itself a violation of Title IX. Correct. A deviation from the policy standing alone is not a per se violation of Title IX. But that doesn't mean that it can't contribute to an inference of gender bias when combined with other factors. And so we have those other factors here. For example, the complainant, Jane Roe, in this case, her initial report was that she was not intoxicated. She stated, I was not incoherent, I was very aware. And she alleged that she was violently, physically forced into a sexual encounter because John Doe supposedly pinned her down and choked her with her own belt. When they got to the hearing, she reversed her allegations 100%. She said that she was completely intoxicated and that the strangulation claim was misleading. She essentially abandoned that claim. So what we have is a situation where her initial complaint and her testimony at the hearing were entirely incompatible. But during the investigation, as the story did change, I guess it was determined that the reason for it was that she was intoxicated. She lied about it at the beginning because she was afraid if she was intoxicated that her claim wouldn't be taken seriously. Why is that finding, why is that consistent with sex discrimination if her reason for an initial lie was believed? So I will say that was the testimony she gave at the hearing, asserting that she lied because she wanted to be believed. And the real issue is when you get to the hearing panel's decision, there's a portion of the report that is intended to address discrepancies between the investigation and the hearing testimony. And they did not in that section say there was a change, we believe her, etc., etc. They wrote no concerns or none identified. So how is that finding consistent with sex discrimination? So again, it's just one of the factors that when we look at in totality because what they did was they refused to acknowledge the credibility issues of the female accuser. They didn't grapple with them and come to a reasoned decision. They just said there are no credibility issues here. But when you look at the way that they treated John Doe's testimony, essentially what they said is, well, he said that he wasn't smoking pot at this party, and we just don't believe that because the party was on April 20th. But let me ask you this. I mean, I guess what I have a hard time with in this case as in Samford, as in Rollins, is that all of that is completely consistent with perhaps a bias in favor of accusers or perhaps just in this case a bias in favor of this person over that person. I don't really understand how it is that we generalize this to sex discrimination. Understood, Your Honor. And so I think the real issue with this sort of alternative explanation of pro-complainant or anti-respondent bias, again, we have to look at where we are in this case. We're on Rule 12. The inferences go to the plaintiff. And this preservers has said that when a complaint can be read in two plausible ways, we must read it in the way that is more beneficial to the plaintiff. But wasn't that true in Samford as well? It was true in Samford as well. Can I add one thing to that? Because in addition to what everything Judge Newsom said, in Samford, and this is on page 691, the Court was at pains to note exactly the kind of fact that you just pointed out to us. Quote, One unsighted portion of the complaint alleges that the hearing panel made no mention of those inconsistencies in the notice of determination. In other words, almost exactly the same thing. And yet there, the rest of that sentence reads, But this allegation does not alter our conclusion. How would it alter our conclusion here? So I think it's a bit of a finer factual distinction, because in that case, the complainant, her allegation the entire time was that she was incapacitated. She never wavered from that claim. She initially claimed she was incapacitated because she believed that she may have been drugged in her alcoholic beverage. And then at the hearing, she essentially said that it was, it may have just been the alcohol. But she never wavered from her claim of incapacitation. How could we find grave, based on the allegations only, taking everything in your favor, in your client's favor, how can we find grave doubt on the merits of the decision, which is what we'd have to do in order to make the inference you want us to make, where the complainant testified here and where three, as I understand it, three separate witnesses supported her claim, both of intoxication and her state of mind in reports immediately afterwards. In other words, there's no doubt that there was conflicting evidence here. There's no doubt that there were inconsistencies. But how can we have grave doubts when there were inconsistencies in Sanford and other cases, but yet a finer fact found based on those conflicts for the complainant? So I think, and I'll make one brief correction. My understanding is that it was two witnesses who testified in favor of Jane Roe, and then there were three witnesses who testified that she was, in fact, sober. And I would also just bring into light that there was a text message that Jane Roe sent in the middle of the interaction. I won't repeat it verbatim because it's vulgar, but it essentially was, we are having sex. And that is extremely inconsistent with her claim that she was pinned down, forced, or incoherent. And if we look at, for example, I believe it's the Oberlin case, the court found that it was a grave error to say that the complainant was incapacitated when the complainant was aware, conscious, awake, and able to send coherent text messages. That very issue was considered to be a grave error. But there were no, but there weren't three witnesses who testified to incapacitation in that case, right? I don't recall specifically, Your Honor. And I would point out, and this would be something we would perhaps cure with an amendment if we end up having that opportunity. But my understanding is that of the two witnesses who testified for Jane Roe, one of them was not even at the party that day. So to the extent that there's, you know, issues with the hearing, I just want to note that, you know, you have Jane Roe, the complainant herself has taken a complete 180. You have the plaintiff and all of the male witnesses being uniformly discredited, while the female witnesses were taken at face value, and the hearing panel did not even acknowledge their credibility issues. So the female witnesses were appearing on behalf of Jane Roe, and the male witnesses were appearing on behalf of John Doe. So how, if the hearing panel agrees with the female witnesses, you're arguing that that is evidence of sex discrimination, but how is it not just pro-complainant bias when it is the complaining party's witnesses that are being believed? So I believe that it is indicative of sex discrimination. If the explanations are equally plausible, again, then on a Rule 12 motion, we have to give plaintiff the benefit. And I just want to speak specifically to the idea that pro-complainant or anti-respondent is inconsistent with gender bias. I don't believe that to be the case. First of all, the Department of Education specifically declared in 2017, and this is in the complaint, the Department of Education expressly stated that a school that favors complainants or disfavors respondents commits discrimination under Title IX. And so if the agency that is tasked with interpreting and enforcing Title IX states that anti-respondent bias is functionally gender bias, we have to argue. But our case in Doe v. Sanford said that it's equally plausible that this is pro-complainant bias as opposed to sex discrimination, correct? I believe that was what the court held in Sanford. So we've got Sanford. But let me actually ask you a question about a procedural irregularity in the complaint that you raised that I'm concerned about. So in paragraph 121 of the complaint, when plaintiff received, your client received notice of the hearing, Emory made clear that the new regulations would not be implemented for this hearing and instead the university would continue to enforce its old Title IX policy. And then in paragraph 123, you say, as a result your client was not permitted to have a representative cross-examine row, which was crucial for credibility determinations given that this is a he said, she said situation. So you're telling me that even though the dear colleague letter has been rescinded, there are new regulations in place that allow for cross-examination for one, Emory said we're not going to follow the new regulations and no cross-examination was allowed? That is correct, Your Honor. And the Doe v. Rensselaer case that's cited in our briefs has held that that exact type of behavior is consistent with gender bias and upheld a motion for a preliminary injunction on the grounds that the school refused to apply the new regulations, even though they already had a policy in place to provide this more fulsome due process. Emory specifically deprived Doe of the opportunity to receive the benefits of the due process that the new regulations were intended to provide. And so, again, this resistance to providing respondent opportunities is one of the factors that goes to gender bias. And I see I'm running out of time. If I could just make one more point. Let Judge Luck ask his question then. I have a follow-up on that. Am I wrong? If I were to say this, tell me if I'm right or wrong when I say this. The new Title IX regulations that came out after the dear colleague letter was rescinded specifically stated that they were not retroactive to cases that were already in the pipeline. Am I correct to say that or not correct? Correct. It was not mandatory for schools to apply the new regulations to cases that were already in the pipeline. And that's actually not what I said. What I said is they said it's not retroactive. Correct. Right. Okay. Thank you. And I would, again, so just going back to the idea of distinguishing this case from Stanford and the idea of anti-respondent or other possible explanations besides gender bias, in the Stanford case, the appellate board actually agreed with John Doe's appeal and said that there were some procedural issues and acknowledged that there were some problems. And they specifically attributed it to having a new policy, having some inexperienced investigators. They did provide a reason. And in this case, there was no reason provided. There was no acknowledgment that anything went wrong. And I would contend that I suspect that Emory's counsel is not willing to stand up here and state something went wrong, they were inept, there was some other explanation. Their position is nothing went wrong in the process. Okay. So that is another distinction from Stanford as far as the alternative explanations. Very well. Well, you'll have your full time for rebuttal. Mr. Bosen, first tell me if I'm pronouncing your name correctly and then approach the podium. Yes, Your Honor. Very well. Thank you. Your Honors, may it please the Court, my name is Joshua Bosen and I have the distinct privilege today of representing Emory University. The decision of this Court must be affirmed for three reasons. But before I begin with those remarks, I'd like to turn to some of the questions that you just were discussing. Can you focus for me first on the breach of contract account? Because I will tell you from my perspective, I'm most troubled by the district court's decision with regard to that. So as I understand the district court's order, it ruled that Georgia requires mutual assent, meaning assent not just from the university, but assent from the students. And here, reading the complaint in the light most favorable to the students, there was not plausible allegations of mutual consent, a mutual assent. That's what I understand the ruling to be. So I looked through the allegations here and it seems to me they boil down to three or four things here. And I want to talk about them. The first is I received this policy and then I paid tuition. Actually, it's first I matriculated to the university. I made a conscious decision to go there. He actually lays out his reasons for choosing Emory. Second, I paid tuition after receiving the policies. And third, and I think maybe most relevantly, and I think the one that we're probably going to talk the most about, is I was in compliance with university policies. In other words, I acted in compliance with them. And while that alone is sort of standing alone in paragraph 176, the earlier paragraphs, and I won't go through them because there are many, show that he, in fact, went along with this long train, this two-year train under Title VII for he showed up, he made allegations, he responded, he sat down for interviews, he went through the hearing, which seems to me to be compliance with the university's policies for Title IX. So all that together, why is the district court not wrong that there was a plausible allegation of mutual assent by the student here? Your Honor, we would offer in response to that that the allegations that Your Honor just cited as well as several of the others that are contained in the complaint are, based on the law of this circuit, simply conclusory. So for example, the statement that upon matriculation I became bound or that the policy contains and represents a contract. So let me be clear. The bound part is a conclusion, but I think everything I said was fact, not conclusion. So let's focus on the things that I said. So I know what the district court said. Matriculating to a university after receiving notice of the policies, that's a fact. I matriculated there. I paid tuition is a fact. I complied is a fact that's possibly maybe conclusory, but then it's added with all the steps he took in complying with and in working with the Title IX framework that was within the policy here. And as you point out, we have the policy because it was attached to the response or attached to the motion to dismiss and the response to it. So how is that not enough? So I think one way to address the question, Your Honor, may be to differentiate between what might be a proper way to plead a claim under Georgia law versus what might be the proper way to plead a claim in federal court, which is the jurisdiction that the plaintiff chose when bringing the breach of contract claim. So OCGA 13-331 says that to constitute a valid contract, of course we know this, there must be parties to the contract consideration and mutual assent. The Georgia Court of Appeals in Broughton v. Johnson stated that the burden of pleading and proving the elements of a contract are the subject matter, consideration and mutual assent by all the parties. The factual allegations that Your Honor has cited to and relies on, I would offer, may in fact have been sufficient if this case was pending in a Georgia court where simple notice pleading is the standard. But here in federal court, under Rule 8, the requirement is that each of those elements may be specifically pleaded. So if we look at the allegations as set forth, the court would be making an implication or an inference of mutual assent. But as I understand Iqbal and Twombly and the cases there, all that's required is a plausible pleading, but we make reasonable inferences from the pleadings in favor of the non-moving party, right? We do make reasonable inferences in favor of the non-moving party, but that does not excuse the fact that the plaintiff does not make a specific finding or a specific allegation of assent. Well, I'm not sure that's right. I mean, I actually think the language that you cite or that you referred to as there's actually an allegation. Upon plaintiff's matriculation to Emory, plaintiff and Emory became mutually bound. And then there's the stuff that Judge Luck has been talking to about that sort of fleshes out that allegation. So I don't think that we can say that he never made an allegation of mutual assent. I think he did in black and white. And then he sort of fleshed it out, fleshed out the theory in the complaint. So if we assume for the fact that he properly made an allegation of mutual assent for purposes of evaluating the contract claim, because if you assume that to be true, there is still this question of whether or not he sufficiently pleaded an express contract or an implied contract. Well, didn't he say it could be either? Didn't he explicitly say it could be either? No, he did not specifically say it could be either. Well, in his pleadings, he said it could be either, right? No, it does not. Well, let me ask you this. For purposes of mutual assent under Georgia law, it doesn't matter if it's oral or written, right? Oral or written or implicit or implied or? Either of those things. In other words, it requires mutual assent no matter what. If it's an express contract, my mutual assent generally is evidenced by the signature on the bottom line. So if it's an applied contract, it's generally done through conduct, right? Correct. Okay. So here there's not, you don't, maybe they should, but they don't assign the bottom line of the policies and procedures of the school, but you're handed the notebook when you first get there. That's what we understand to have happened here. And he says, I entered the university, I accepted its admission there, understanding these policies. I believe myself to be bound by those things. I paid tuition understanding that. And then I acted in accordance with it. I complied with those policies. So, again, why is that not conduct for even an implied contract? Well, with respect to an implied contract, Your Honor, if you assume for the moment, for sake of argument, that assent was properly pleaded, which of course we do not concede, an important element of pleading implied contract is that there exists a policy or practice between the parties that is customary. And in this case, especially if you look at paragraph 176 of the complaint where this issue is alleged, there is no discussion at all of a custom that existed between these two parties. Now, this is – Isn't the allegation, though, that there's a written set of policies and procedures that's given to you when you're admitted, it includes the Title IX policy, and based on that, I did the four things I've laid out now, I'm not going to repeat myself? Well, that may very well be true, but there is no specific allegation to the plaintiff himself. And in the putative class action that is now pending against Emory that was before Judge Thrash in 2021, this exact issue was raised. And in that case, the Court said that to evaluate an implied contract theory, assume for the moment that mutual assent exists, if there is no specific allegation of custom and practice as between the parties, the actual parties themselves, then there can be no implied contract theory that will lie. Is there any other argument you have with regard to a breach of contract that we want to talk about? I do think, Your Honors, that with respect to the breach of contract argument, it is telling, and we lay this out in our briefs, that the policy upon which plaintiff relies is amendable at will. And there is significant – Show me where in the – that it says amendable at will. I understand the allegation is every year they sort of update their policies. That makes sense as stuff happens, as new classes come, because it includes courses and things, so I get that. But where does it say in the policy that we have in this record that it's amendable at will? It does not specifically say that, Your Honor. That seems to be problematic. I don't think it's problematic, Your Honor, because the plaintiff specifically alleges in his complaint and acknowledges that the policy is updated and changed annually. But does the complaint – can we infer against the plaintiff from the complaint that the policy is amendable at will? Without any input from him or other students or community or anything like that? That Emory has a unilateral ability – can we infer from the complaint that Emory has the unilateral ability to update its policies at will? I don't think that that is an improper inference, Your Honor, at this point when the plaintiff affirmatively states in his allegations that the policy is amendable each and every year. I mean, that is not – Amendable or amended? Amended. Amended. That is not something that he hides from. In fact, it's an affirmative allegation, so I don't think that would be an adverse inference drawn in his favor. But isn't amending a – having a school amend a policy at the beginning of each school year very different from an amendable at will throughout the course of the year without any notice to the student? Isn't that different? Your Honor, I would suggest it's not different because if you look at the actual policy 8.2, which we appended to our motion to dismiss, there's a very clear history of how the policy is amended and how many times it was amended. And in this case, consistent with plaintiff's allegations in the complaint, it was actually amended or revised 17 times, sometimes multiple times in a year. To say that that is inconsistent with the law regarding the amendability doctrine, which is that if something is amendable at will, it cannot therefore constitute a binding contract, we would proffer that that is not an inconsistent reading of existing Georgia law, the policy itself, and the allegations that plaintiff pleaded in his complaint. Can I ask you a procedural question about what happens next? So let's assume for the moment – this is just a pure speculation – that we reverse on the breach of contract claim, that we find that the district court improperly granted dismissal with regard to that. Is the plaintiff going to be allowed to file a motion to amend under Rule 15 to amend the entirety of the complaint? Under Rule – if the reversal is only on the contract claim, Your Honor, I expect one outcome would be that the Title IX claim, assuming that the court did not reverse on that basis, then there would be an opportunity conceivably for amendment to occur. But the problem there, Your Honor, is that the court, based on the body of law in this circuit, would suggest that dismissal would be appropriate for lack of subject matter jurisdiction. And while that is not mandatory, in many of the court's recent cases in the district where there is no pending Federal claim that remains in such a case, they may in fact refuse to exercise that right. You have to go through the analysis under 1367C, right? Yes. Okay. All right. But there would at least be an opportunity to amend before that decision would be made, right? I think it's an interesting procedural question because if the case gets sent back with a direction that the court reconsider, the court may find that it lacks jurisdiction if the only question before it is the remaining contract claim. So it may be that no amendment could be had until there was a determination of the proper venue at that point in time for potentially refiling. Now, the court may very well say, based on the decision of the Eleventh Circuit, we're going to continue. I'll accept supplemental jurisdiction, amend your complaint. But that is fully within the court's discretion. Let me ask you some questions about Title IX. So obviously, as we have discussed, Doe v. Sanford does a lot of work that is helpful to Emory in this case. But in this case, Doe v. Sanford does talk about a pro-complainant bias not rising to the issue of sex discrimination. But here, at least the argument would be that it goes beyond pro-complainant bias, that it's not just favoring the testimony of Jane Roe, that it's favoring all of her witnesses to the exclusion of John Doe's witnesses. Is that a distinguishing factor here? And if it is different from the Sanford University case, does that carry the day for her? Thank you, Judge Branch. We don't think that that is a distinguishing factor. In fact, we do believe that this case really is on all fours with Sanford. And I will go to the language that Judge Lux actually cited, which I was going to bring to the court's attention. And that is because a lot of the discussion about the procedural irregularities and some of the issues raised by the plaintiff go, in fact, to the question of credibility. And here, the issue is whether or not the hearing panel engaged in an appropriate analysis. First, I will say, one, that this venue is not an appropriate venue to collaterally attack the disciplinary hearing. We're talking about whether what happened there has the potential to give rise to a question about grave doubt. The decision in this case is quite different than the decision where the grave doubt theory originated in the Sixth Circuit in the Oberlin case. In that particular instance, there was a substantial difference between what the hearing panel actually found and the allegations of incapacitation that the investigator found. Clearly different. In that case, there was clear evidence that the complainant asked for a condom, that there was text messages, that there were conversations. This whole idea of intoxication and capacitation was treated very differently than it was here in our case, where there was a credibility determination made by the hearing panel. And to go back to the language cited by Judge Locke, it's interesting that the court hones in on this in Sanford that says we regularly permit fact finders to make unstated but implicit credibility determinations in more formal settings than school disciplinary hearings, such as in criminal proceedings. We cannot hold the hearing panel to a higher standard than we hold district courts, citing Byrd of curators in the Supreme Court in 1978. So we would argue, Your Honor, that there is no substantial difference based on the facts in this case as to those in Sanford. I see my time has concluded. Thank you very much. All right, let's hear a rebuttal. Your Honors, I'd just like to start with addressing one of the contentions by my colleague on the other side who stated that there was no allegation of express and implied contracts. I believe the specific complaint citation is in my briefs, but the complaint did specifically state that Emory breached express and implied agreements. So implied was specifically stated in the complaint. I have it at page 4, for what it's worth. I have it at page 4 of the complaint. Thank you. With regard to the issue of... that was asked of my colleague with regarding to amending the allegations if this case is remanded back to the district court, I do want to note that this was brought on both federal jurisdiction and all sides of diversity, so the district court would still have jurisdiction over the contract claim. Can I ask you about Kuritzky, which I think is not a surprise. It's a case that's cited by both of you guys. Kuritzky stated that Georgia law permits an expelled student to bring a breach of contract action against a private educational institution for failure to abide by the hearing procedures set forth in the student handbook. There are a few other cases that cite that, that dance around that, but Kuritzky says it very particularly. Now, Kuritzky is not a mutual assent case. Does that mean that inherently that any expelled student has a claim based on the policies and procedures, or is your understanding that Georgia law still does require mutual assent that has to be pled in a complaint? My understanding is that the Georgia state courts to resolve this issue have created, let's say put a gloss on the mutual assent and essentially holding that the nature of the relationship between the student and the university is inherently contractual because of the dissemination of the policy and the payment of tuition. They haven't quite said it as articulately as you just did, right? It has never been made explicit. However, I would also note that none of the cases cited by Emory, and again, we're the appellant, but the burden is on Emory to prove that there's no claim. None of the cases cited by Emory address this issue on the pleadings they quote almost exclusively from merits decisions that ultimately found there was no proof of these factors, but the cases from the Georgia state courts have consistently stated that this relationship specifically is inherently contractual. In absence of something like an express waiver that's in the contract, the allegations of attending the school, complying with the policy, paying tuition, fall into mutual assent for the contract. And I believe that the 2021 Georgia district court case addressing the Emory case, Judge Strasser's decision, sort of came to that exact conclusion. They held that it was not sufficient for an express contract, but it was sufficient for an implied contract. And so that's sort of exactly the situation that we have here. I did want to address just one more issue regarding the sort of reconsidering the hearing board's credibility determinations and the quote that my colleague provided about, you know, it's not unusual for an adjudicator to make an unstated credibility determination, but the issue here is that Emory's appeal policy, their documents specifically provide a section to do just that. So while it may be the case that in an ordinary judicial determination there are credibility decisions made without explicit statements as to how they were reached, Emory's process seemingly required a specific examination of the credibility issues. There was a section of the report dedicated to addressing inconsistencies. And rather than addressing the inconsistencies, Emory's hearing panel said there are none. That is blatantly incorrect. And so that's the type of grave error that we get to when we talk about pushing this case over the plausibility line, getting around the issues that were identified in Sanford. I see that my time is up. Counsel, before you sit down, I have one thing I want to address. I'm looking at your reply brief at page 9, footnote 6. And I'm not going to quote it out loud, but I will say this. I don't think it's appropriate to have that kind of intimation and implication in a brief like that where you're impugning the integrity of somebody. And, Counsel, let me finish. I just think it's something you should think seriously about. If you have the kind of issue you state here, there's a mechanism for doing that. But simply because somebody is associated with something doesn't mean that they are intentionally biased against you and acting contrary to their oath and contrary to their stated ethics. And I think having that implication is where they don't have the ability to respond to that is just not an appropriate thing to do. And I would ask you to please not put something like that when you file briefs in this court, okay? Yes, I understand, Your Honor, and I do apologize. And it was not my intention at all to impugn the integrity of the district judge. It was just my intention to bring to light the very human nature of the idea that, you know, if you were to ask me, I loved my law school. I had a great experience there. They gave me a scholarship that allowed me to go. I have very positive feelings about them. So if somebody came to me and made a negative assertion about my law school, human nature, I would inherently view that with skepticism. And so my purpose in the footnote was just to address this, you know, with regard to the issue of having judges decide on the pleadings, what they think the most likely unspoken motivation of a party is, brings the issue of it's just human nature that some of these claims may be viewed with skepticism. It was not intended to be any sort of accusation. I appreciate the court's position, and I would not do that. Counsel, just to be clear, I attended Emory Law School. I have served on boards and currently serve on a board for Emory Law School that I have formally disclosed. I have formally served on boards at Emory University. So I just, that's up to you to decide what you want to do with that information. But just to be clear, but I joined Judge Luck. I'm disappointed in that footnote. I understand, Your Honor. So again, I do apologize. It was not my intention to make any sort of accusation, but merely to acknowledge that having these decisions about someone else's unspoken state of mind on a Rule 12 motion leads to problems because it's just human nature, and it was not intended to be anything more than that. I do apologize again. Very well. We appreciate and accept the apology. We're going to take a three-minute break. We'll be back promptly at 10 till. Brian, can I borrow you for a sec? All rise.